IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PDC MACHINES INC. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 17-5399 |
| | : | |
| NEL HYDROGEN A/S | : | |
| *formerly known as* | : | |
| H2 LOGIC A/S, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, C.J.**                                            **August 22, 2018**

Defendants Nel Hydrogen A/S (Nel), formerly known as H2 Logic A/S, and Nel employee Joshua Andrew Adams move to compel arbitration of all claims asserted against them in this action by Plaintiff PDC Machines, Inc. (PDC) pursuant to an arbitration provision in a 2013 Cooperation Agreement between Nel and PDC. Defendants also move to stay this case pending completion of the arbitration in Denmark. PDC opposes the motion, arguing Defendants have waived their right to demand arbitration by actively participating in this litigation for several months before belatedly raising the prospect of arbitration, and that the arbitration clause in the 2013 Cooperation Agreement does not cover PDC's claims in this case in any event. Because the Court agrees with PDC on both issues, Defendants' motion to compel will be denied.

## BACKGROUND

PDC is a technology design and manufacturing company that provides engineered solutions for the specialty gas and chemical processing industries worldwide using proprietary technology it has developed through a substantial investment of time and resources over a 40-year period. From October 2007 to June 2011, Defendant Adams worked for PDC as a project engineer. In this capacity, Adams was integrally involved in the research, development, and

design of PDC's high pressure hydrogen diaphragm compressors and became intimately familiar with PDC's trade secrets related to the development of its compressors. As a condition of his employment with PDC, Adams agreed to sign a "Confidentiality and Non-Disclosure Agreement" (the Adams NDA), which prohibited him from publishing, disclosing, disseminating, or using any of PDC's confidential information, including PDC's trade secrets, without PDC's express written consent. *See* Adams NDA 1-2, ECF No. 51-2.[1] The Adams NDA provides that it is to be construed and enforced in accordance with Pennsylvania law and reflects the employee's consent to venue in the Court of Common Pleas of Montgomery County, Pennsylvania. *See id.* at 2. It does not include an arbitration clause.

In 2008, PDC entered into a contractual relationship with Nel, a "global, dedicated hydrogen company" based in Denmark, whereby PDC agreed to develop high pressure hydrogen gas diaphragm compressors for Nel. *See* Compl. ¶¶ 25-26. Also in 2008, PDC and Nel entered into a "Confidential Non Disclosure Agreement" (the Nel NDA) which "set forth the rights and obligations of the Contract Partners [i.e., PDC and Nel] with respect to the use, handling, protection and safeguarding of Proprietary information which is disclosed by and between the Contract Partners" as part of their "existing cooperation, or plan for cooperation, . . . for the purpose of supplying compression systems to [Nel]." Nel NDA 1, ECF No. 57-1.[2] The Nel NDA prohibits Nel from "undertak[ing] any qualitative or quantitative analysis, reverse engineering or replication of any product containing proprietary information unless authorized to do so by the disclosing party." *Id.* The Nel NDA also specifies that it is to be "governed by and

---

[1] The Adams NDA is attached as Annex PB2 to the July 19, 2018, Declaration of Peter Bang in support of PDC's opposition to the motion to compel arbitration.

[2] The Nel NDA is attached as Exhibit B to the July 27, 2018, Declaration of Jason A. Wrubleski in support of Defendants' reply in support of the motion to compel arbitration.

construed exclusively in accordance with Danish law," "contains the entire agreement between the contract partners," and may be modified only "in writing signed by both partners." *Id.* at 2. Like the Adams NDA, the Nel NDA does not include an arbitration clause.

In April 2013, PDC and Nel entered into a Cooperation Agreement setting forth the terms on which PDC would "supply finished materials to [Nel]." Cooperation Agreement 1, ECF No. 57-1.[3] The Cooperation Agreement governs "[a]ll purchase of goods between [Nel] and [PDC]," *see id.*, and addresses how orders are to be placed, confirmed, and cancelled, and issues such as quality standards for the goods, the applicable warranty, procedures for complaints and for repair and replacement of defective materials, shipping, payment terms, technical support, and insurance. The Cooperation Agreement also includes the following arbitration provision:

> This general condition is subject to applicable Danish law. In case of a dispute between Parties in connection with this Agreement the following steps shall be taken. The parties will attempt in good faith to resolve any dispute or claim arising out of or relating. [sic] Agreement promptly through negotiations between the respective senior executives of the parties who have authority to settle the same.
> The Court of Arbitration shall be appointed geographically in the judicial district of Herning. The Danish Act on Arbitration shall apply with any amendments as a consequence of the above.

*Id.* at 3.[4]

Throughout its relationship with Nel and pursuant to the Nel NDA, PDC has shared many trade secrets with Nel, including customer versions of PDC's proprietary computer software, schematic drawings, 3D models, calculations, descriptions of compressor features, technology

---

[3] The Cooperation Agreement is attached as Exhibit A to the July 27, 2018, Declaration of Jason A. Wrubleski in support of Defendants' reply in support of the motion to compel arbitration.

[4] The parties and their Danish law experts appear to agree that the arbitration provision contains typographical and grammatical errors and that the phrase "dispute or claim arising out of or relating. Agreement" should be understood to refer to any "dispute or claim arising out of or relating *to this* Agreement."

and product performance data, and PDC compressors themselves, which embody numerous trade secrets ascertainable only by reverse engineering or other analysis prohibited by the Nel NDA. Adams has also been privy to PDC's trade secrets and other confidential and proprietary information through his employment with PDC.

Sometime in 2017, PDC discovered that Adams, who left PDC in June 2011, had begun working for Nel and that Nel had filed at least one patent application, on which Adams is listed as the inventor, claiming a high pressure diaphragm hydrogen compressor to be used in hydrogen refueling stations. *See* Decl. of Kareem Afzal in Supp. of Pl.'s Mot. for Preliminary Inj. Exs. D & E, ECF No. 18-2 (Apr. 24, 2017, letters from PDC's counsel to Nel Managers and Adams). PDC contends the compressor described in Nel's patent application is the same as PDC's hydrogen gas diaphragm compressor except for the shape of the gas chamber. Although the patent application does not disclose the confidential processes and know-how needed to design and operate a high pressure hydrogen diaphragm compressor suitable for use in industrial applications, PDC understands that Nel professes to have designed such a compressor and is seeking to market hydrogen fueling stations incorporating this technology to potential customers. PDC also understands that Defendants have attempted to recruit other PDC employees to work for Nel on its diaphragm compressor technology.

Given the investment of time and resources it took for PDC to develop its high pressure diaphragm compressor technology, and the inability of any of PDC's competitors to commercialize such technology despite decades of effort to do so, PDC believes Nel could not have independently developed a high pressure diaphragm compressor technology in the space of just a few years without making use of the PDC trade secrets in its possession. Similarly, PDC believes Adams could not have purported to invent the technology claimed in the Nel patent

application without making unauthorized use and disclosure of the PDC trade secrets he learned either during his employment with PDC or through his subsequent employment with Nel. PDC thus maintains that Defendants have made, and continue to make, unauthorized use of PDC's trade secrets in designing, developing, manufacturing, and selling or offering for sale their high pressure hydrogen gas diaphragm compressors. *See* Compl. ¶¶ 50-52, 55-56.

In December 2017, PDC filed this action against Nel and Adams, asserting claims against both Defendants for violations of the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b), the Pennsylvania Uniform Trade Secrets Act (UTSA), 12 Pa. Cons. Stat. Ann. §§ 5301-5308, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Cons. Stat. Ann. §§ 201-1 et seq., and for conversion, unjust enrichment, conspiracy, and breach of contract (specifically, the Nel and Adams NDAs).[5] PDC also asserts a claim for breach of fiduciary duty of loyalty against Adams. Defendants promptly executed waivers of service, and on March 1, 2018, Defendants filed a motion to dismiss five of the nine claims in PDC's Complaint. In April 2018, while the motion to dismiss was pending, PDC moved for a preliminary injunction, expedited discovery in aid of the preliminary injunction motion, and entry of a protective order, and Defendants filed a motion for pre-discovery identification of trade secrets the following month.

On May 24, 2018, after the foregoing motions were fully briefed, the Court held a joint Rule 16 conference and oral argument on Defendants' partial motion to dismiss and motion for pre-discovery identification of trade secrets and PDC's motion for expedited discovery and entry

---

[5] Although PDC did not file this action until December 2017, the company notified Nel and Adams in April 2017 that it intended to bring suit against them in federal court in Pennsylvania in the event the issue of their wrongful use and disclosure of PDC's trade secrets was not otherwise resolved. Decl. of Kareem Afzal in Supp. of Pl.'s Mot. for Prelim. Inj. Exs. D & E, ECF No. 18-2.

of a protective order.[6]  At the conference, the Court proposed giving the parties a 90-day discovery period and a prompt trial on the merits, in lieu of the phased approach proposed by PDC (i.e., expedited discovery and a preliminary injunction hearing, followed by additional discovery and a trial), and the parties agreed to the Court's proposal.  *See* Tr. 39-43, May 24, 2018.  Following the conference, the parties jointly submitted a stipulated proposed case management order reflecting the agreed upon 90-day discovery period, with fact discovery to close on August 17, 2018, but proposing alternative dates for trial and certain other case management deadlines.  The parties also served discovery requests and began the process of responding to each other's requests.[7]

On June 8, 2018, the Court entered a Case Management Order.  The following week, on June 15, 2018, the Court issued a Memorandum and Order granting in part and denying in part Defendant's motion to dismiss.[8]

On June 28, 2018, more than a month into the 90-day discovery period, Defendants raised the prospect of arbitration for the first time, notifying PDC they intended to file a motion to compel arbitration of this action in Herning, Denmark, pursuant to the arbitration provision in the Cooperation Agreement.  Decl. of Jason A. Wrubleski in Supp. of Defs.' Mot. for Expedited Hr'g and Stay Pending Determination of Mot. to Compel Arbitration Ex. A.  The following day,

---

[6] The Court's May 2, 2018, Order scheduling the Rule 16 conference and oral argument directed the parties to complete Federal Rule of Civil Procedure 26(a) disclosures, to confer pursuant to Rule 26(f), and to complete and submit to the Court a joint Rule 16 conference information report in advance of the conference, which they did.  *See* Order, May 2, 2018, ECF No. 20.

[7] Indeed, the parties appear to have commenced discovery even before the May 24, 2018, conference.  *See* Tr. 123-24, Aug. 7, 2018 (noting that when the parties agreed to a "fast-track discovery schedule, [D]efendants already had served their request for discovery on May 18th").

[8] The Court granted the motion as to PDC's UTPCPL claim, which PDC agreed to withdraw, but denied the balance of the motion.

on June 29, 2018, Defendants filed their Answer, Affirmative Defenses, and Counterclaims in this action, raising the Cooperation Agreement's arbitration provision as an affirmative defense.[9] A week later, on July 7, 2018, Defendants filed the instant motion to compel arbitration and stay proceedings. Defendants also sought to stay the case pending disposition of the motion to compel arbitration. The Court heard argument on the motion to compel arbitration on August 7, 2018.

**DISCUSSION**[10]

"An arbitration provision in an international commercial agreement is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards" (the Convention). *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 448-49 (3d Cir. 2003). Under the Convention, to which the United States and Denmark are both signatories, a district court must order arbitration of a dispute when (1) there is "an agreement in writing to arbitrate the subject of the dispute"; (2) the agreement "provide[s] for arbitration in the territory

---

[9] Although Nel asserted counterclaims against PDC for breach of the Cooperation Agreement and breach of express warranty, Nel asserted these counterclaims with the caveat that it believes the counterclaims (as well as PDC's claims) are subject to the mandatory arbitration provision in the Cooperation Agreement. *See* Counterclaims ¶ 4.

[10] Although the parties acknowledge that in the Third Circuit, a motion to compel arbitration may be considered under the motion to dismiss standard of Federal Rule of Civil Procedure 12(b)(6) or under the summary judgment standard of Rule 56, depending on the circumstances, *see Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771-76 (3d Cir. 2013), they do not take a position on which standard the Court should apply in this case. Because both parties rely on material outside the pleadings in support of their respective positions—including, most prominently, declarations from competing experts on Danish law—it is appropriate to evaluate the motion to compel arbitration under the summary judgment standard. As discussed below, because the dispute regarding arbitrability ultimately turns on the legal question whether PDC's claims are within the scope of the arbitration provision in the 2013 Cooperation Agreement, the same analysis would apply, even if the Court were to evaluate the motion under the Rule 12(b)(6) standard. The Court notes that no party asserts a need for discovery on the issue of arbitrability.

of a signatory of the Convention"; (3) the agreement "arise[s] out of a legal relationship, whether contractual or not, which is considered as commercial"; and (4) either a party to the agreement is not an American citizen or the commercial relationship between the parties has "some reasonable relation with one or more foreign states."[11] *Id.* at 449 & n.13. The Convention is implemented in the United States by the second chapter of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 201-208, which "empowers district courts to compel arbitration in accordance with agreements and to enforce awards falling within the . . . Convention." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522-23 (3d Cir. 2009) (internal citations omitted). Before compelling a party to arbitrate pursuant to the FAA—whether in the domestic or the international arbitration context—"a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Id.* at 523.

The parties agree that the 2013 Cooperation Agreement contains an agreement to arbitrate. Indeed, both parties have submitted declarations from experts in Danish law opining as much. *See* Decl. of Jacob Møller Dirksen ¶¶ 17-21, ECF No. 46-1 (opining that the arbitration provision in the Cooperation Agreement "would be construed by a Danish court or arbitral tribunal established under Danish law as fulfilling the essential requirements [of an arbitration agreement] that [PDC] and Nel have (1) agreed to (2) arbitrate their disputes in Denmark"); Decl. of Peter Bang ¶ 4.4, ECF No. 51-2 (agreeing with Dirksen's observations regarding "the existence, validity and operability of the dispute resolution clause" in the Cooperation Agreement). The dispute in this case instead centers on whether the claims asserted by PDC in

---

[11] There is no dispute that requirements (2) through (4) are satisfied here. Defendants assert— and PDC does not contest—that (a) the arbitration clause in the Cooperation Agreement provides for arbitration in the territory of Denmark, which, as noted, is a signatory to the Convention; (b) the Cooperation Agreement containing the arbitration clause is commercial in nature; and (c) Nel, a party to the Cooperation Agreement, is not an American citizen but a Danish corporation.

this action are within the scope of the arbitration clause,[12] and whether Defendants have waived their right to demand arbitration by their active participation in this litigation before raising the prospect of arbitration.

As to the former issue, the parties also disagree regarding the applicable law. Defendants argue that whether the arbitration provision covers PDC's claims in this action is a question of federal law, while PDC maintains the issue is one of Danish law, which the parties agree governs the Cooperation Agreement. In *Century Indemnity Co. v. Certain Underwriters at Lloyd's, London*, the Third Circuit Court of Appeals clarified that while in determining whether a valid agreement to arbitrate exists, a court applies "ordinary state-law principles that govern the formation of contracts," the separate question "whether a particular dispute is within the class of those disputes governed by the arbitration clause . . . is a matter of federal law." 584 F.3d at 524 (alteration in original) (citations omitted); *accord Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1463 (9th Cir. 1983) (holding an action brought under the FAA "is properly characterized as arising under the body of federal law regulating interstate commerce," and "[f]ederal law therefore applies to [a court's] determination of the scope of th[e] arbitration agreement"). Based on *Century Indemnity*, the Court agrees with Defendants that whether

---

[12] Although Defendants seek to compel arbitration of "[a]ll claims and counterclaims in this action," *see* Defs.' Proposed Order Granting Mot. to Compel Arbitration, ECF No. 46, they address the counterclaims only in a footnote in their motion to compel, asserting that the counterclaims are "clearly arbitrable" as they are "for breach of the agreement containing the arbitration provision." Defs.' Mem. in Supp. of Mot. to Compel Arbitration 9 n.2, ECF No. 46. PDC does not respond to this argument. While the Court agrees with Defendants that Nel's counterclaims for breach of the terms of the Cooperation Agreement, including the express warranty contained therein, are clearly within the scope of the Cooperation Agreement's arbitration provision, it is not clear whether Nel wishes to arbitrate the counterclaims in the event the Court declines to compel arbitration of PDC's claims. Should Nel wish to arbitrate its counterclaims, the Court sees no reason why it should not be permitted to do so.

PDC's claims are within the scope of the Cooperation Agreement's arbitration clause is governed by federal law.[13]

"[W]hether a dispute falls within the scope of an arbitration clause depends upon the relationship between (1) the breadth of the arbitration clause, and (2) the nature of the given claim." *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014). In considering this question, a court must "focus [] on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Id.* at 173 (alteration in original) (quoting *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001)). "If

---

[13] At oral argument, PDC suggested the Supreme Court's decision in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), supports PDC's contention that the scope of the arbitration provision in the Cooperation Agreement is governed by Danish law, citing the Court's statement that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts," *id.* at 944. The Third Circuit Court of Appeals, however, has not interpreted *First Options* in the manner suggested by PDC. Rather, in *Century Indemnity Co.*, the Court of Appeals construed the cited passage from *First Options* as setting forth the applicable law for purposes of determining only "whether the parties have agreed to arbitrate." 584 F.3d at 524 ("To determine whether the parties have agreed to arbitrate, we apply 'ordinary state-law principles that govern the formation of contracts.'" (quoting *First Options*, 514 U.S. at 944)). As to the separate question whether a particular dispute is within the scope of the parties' agreement to arbitrate, the Court of Appeals went on to hold that this issue is governed by federal law. *See id.* ("[O]nce a court has found that there is a valid agreement to arbitrate, regardless of whether the action is in a federal or a state court the determination of whether 'a particular dispute is within the class of those disputes governed by the arbitration clause . . . is a matter of federal law.'" (quoting *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 290 (3d Cir. 2003))). *General Electric Co. v. Deutz AG*, 270 F.3d 144 (3d Cir. 2001), another case referenced by PDC at oral argument, also does not support PDC's position. In *Deutz*, the Court of Appeals upheld the district court's application of Pennsylvania law to determine whether the parties had agreed to arbitrate their disputes, but observed the separate question "whether a particular dispute is within the class of those disputes governed by the arbitration and choice of law clause is a matter of federal law." *Id.* at 153-54 (quoting *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 43 (3d Cir. 1978)).

To the extent that the scope of the arbitration provision in the Cooperation Agreement is a question of Danish law, the Court notes that only PDC has produced evidence on this issue. *See* Decl. of Peter Bang ¶¶ 5.1-5.9, 6.1-6.7, 8.1, ECF No. 51-2 (opining that, under Danish law, the arbitration clause in the Cooperation Agreement cannot be construed to cover PDC's claims against Nel or Adams).

the allegations underlying the claims 'touch matters' covered by [the arbitration clause], then those claims must be arbitrated whatever the legal labels attached to them." *Brayman Constr. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987)). "[W]here an arbitration agreement is ambiguous about whether it covers the dispute at hand," the court's analysis is guided by the FAA's presumption in favor of arbitration, and the court "must resolve 'any doubts concerning the scope of arbitrable issues . . . in favor of arbitration.'" *CardioNet*, 751 F.3d at 172-73 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). "Otherwise, the plain language of the contract controls." *Id.* at 173 (internal citation omitted).

The arbitration provision in the Cooperation Agreement is broadly worded, setting forth the steps to be taken "[i]n case of a dispute between Parties *in connection with this Agreement*" and requiring the parties to "attempt in good faith to resolve any dispute or claim *arising out of or relating [to this] Agreement* promptly through negotiations," following which, the dispute or claim, if not resolved, must be submitted to arbitration. Cooperation Agreement 3 (emphasis added). Thus, to determine whether PDC's claims are encompassed by the arbitration provision, the Court must consider whether the factual underpinnings of those claims "touch" matters covered by the arbitration provision—i.e., matters "in connection with" or "arising out of or relating [to]" the Cooperation Agreement.

Although PDC seeks to recover against Nel under several different legal theories, all of PDC's claims against Nel are based on the same core underlying facts regarding Nel's alleged misappropriation of PDC's trade secrets. PDC alleges that during the course of the parties' business relationship, PDC has shared trade secrets with Nel pursuant to the Nel NDA, including by providing Nel with PDC compressors "which embody numerous PDC Trade Secrets that can

be ascertained, if at all, only by reverse engineering or other analysis that is prohibited by the Nel NDA." Compl. ¶ 29. PDC further alleges that Nel has misappropriated PDC's trade secrets by using or disclosing them in violation of the Nel NDA to develop a competitive high pressure hydrogen diaphragm compressor.

Defendants argue PDC's claims against Nel are "in connection with" or "related to" the Cooperation Agreement because the claims are based in part on Nel's alleged misuse of compressors sold to Nel pursuant to the Cooperation Agreement—specifically, Nel's analysis and reverse engineering of the compressors, which embody the trade secrets, in violation of the Nel NDA. Defendants further argue PDC's allegations that Nel misappropriated trade secrets supplied under the Nel NDA are "in connection with" or "related to" the Cooperation Agreement because the Nel NDA "expressly contemplates that a future cooperation agreement will encompass the sale and handling of confidential information." Defs.' Reply in Supp. of Mot. to Compel Arbitration 2, ECF No. 57. The Court disagrees.

The Nel NDA recites that the purpose of the Agreement is "to set forth the rights and obligations of the Contract Partners [i.e., PDC and Nel] with respect to the use, handling, protection and safeguarding of Proprietary information which is disclosed by and between [them]" in connection with their "existing cooperation, or plan for cooperation, . . . for the purpose of supplying compression systems to [Nel]." Nel NDA 1. Although the parties entered into the Nel NDA in anticipation that PDC would supply compression systems to Nel, and with the expectation that their cooperation on this endeavor would "include the exchange of confidential information," *id.*, the NDA gives no indication that the parties contemplated that the handling of confidential information would be the subject of a future agreement between them. On the contrary, the Nel NDA includes an integration clause specifying that "[t]his Agreement

[i.e., the Nel NDA] contains the entire agreement between the contract partners" and that "[a]ny modification must be made in writing signed by both partners." *Id.* at 2. And while the parties later entered into the Cooperation Agreement governing "[a]ll purchase of goods" between them, they did not address the handling of confidential information as part of that Agreement. The Cooperation Agreement includes no provisions regarding confidentiality and does not mention the Nel NDA, much less purport to modify or supersede it. Hence, contrary to Defendants' assertion, the structure of the two agreements suggests the parties intended the Nel NDA and the Cooperation Agreement to be separate agreements, with confidentiality to be addressed solely in the Nel NDA.

This case is thus distinguishable from *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999), cited by Defendants, in which claims for misappropriation of trade secrets and breach of nondisclosure agreements were found to be arbitrable pursuant to arbitration clauses in a series of later agreements between the parties. In *Simula*, as in this case, the parties entered into nondisclosure agreements at the outset of their contractual relationship in 1993, and the plaintiff thereafter disclosed confidential, proprietary, and trade secret information to the defendant. *See* 175 F.3d at 718. The 1993 nondisclosure agreements did not include arbitration clauses. *See id.* at 725. Two years later, in 1995, the parties entered into a series of related agreements pursuant to which the defendant acquired an exclusive license to market a proprietary airbag system invented and manufactured by the plaintiff. *See id.* at 718-19. The 1995 agreements included identical arbitration clauses requiring arbitration of "[a]ll disputes arising in connection with this Agreement." *See id.* at 720.

Unbeknownst to the plaintiff, before entering into the 1995 agreements, the defendant in *Simula* had begun working with another automobile company to develop a product that would

compete with the plaintiff's airbag system. After learning of these efforts, the plaintiff brought suit, asserting claims against the defendant for misappropriation of trade secrets, breach of the nondisclosure agreements, and other statutory and common law causes of action. In response, the defendant moved to compel arbitration of all claims pursuant to the arbitration clauses in the 1995 agreements. Construing the "arising in connection with" language in the arbitration clauses to reach "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract," *id.* at 721, the court held the plaintiff's claims, including the trade secret-related claims, were arbitrable. In so holding, however, the court relied on the fact that the 1993 nondisclosure agreements had been subsumed by the 1995 agreements pursuant to a merger provision in the later agreements, such that the defendant's obligations under the nondisclosure agreements were incorporated into the 1995 agreements. *See id.* at 723-25. The court therefore concluded the trade secret-related claims were "dependent on the 1995 [a]greement[s]" and were subject to arbitration under the arbitration clauses in those agreements. *See id.* at 725.

Like the nondisclosure agreements in *Simula*, the Nel NDA was "a significant part of the business relationship" between Nel and PDC which enabled Nel to gain access to PDC's confidential and proprietary information. *See id.* Unlike in *Simula*, however, the Cooperation Agreement does not include an integration clause or otherwise reference the Nel NDA, and does not "expressly prohibit[] the misuse of proprietary information" or otherwise impose any confidentiality obligations on Nel. *See id.* at 724-25. Rather, as noted, Nel's confidentiality obligations exist solely under the Nel NDA, not the Cooperation Agreement. There is thus no basis on which to conclude that the Nel NDA was "subsumed" or "reaffirmed" by the Cooperation Agreement, *see id.*, and *Simula* is therefore inapposite to the instant dispute, *cf.*

*Microbilt Corp. v. Chex Sys., Inc. (In re Microbilt Corp.)*, 588 F. App'x 179, 180-81 (3d Cir. 2014) (holding tortious interference claims based on the defendant's alleged disclosure of information defined as "confidential" under the terms of a Resale Agreement between the parties were within the scope of an arbitration clause requiring arbitration of "[a]ny dispute, difference, controversy or claim arising out of this Agreement" because the claims "relate[d] to the parties' obligations under [the Resale Agreement]"); *PNY Techs., Inc. v. Samsung Elecs. Co.*, No. 10-4587, 2011 WL 900154, at *2-6 (D.N.J. Mar. 14, 2011) (holding claims for violations of a 2008 nondisclosure agreement without an arbitration clause were subject to arbitration based on arbitration clauses in three subsequent agreements between the parties, where the three subsequent agreements all contained confidentiality provisions covering the disclosures at issue—one of which incorporated the earlier nondisclosure agreement by reference—and where two of those agreements contained integration clauses by which they superseded the 2008 nondisclosure agreement).

Nor is the Court persuaded that the fact that PDC compressors purchased pursuant to the Cooperation Agreement may have been the source of some of the allegedly misappropriated trade secrets is a sufficient basis on which to find that PDC's claims against Nel are encompassed by the Cooperation Agreement's arbitration provision. Although the arbitration provision is broad, reaching all disputes "in connection with" or "relating to" the Cooperation Agreement, the presence of an integration clause in the Nel NDA and the lack of an integration clause or any reference to the NDA or confidentiality in the Cooperation Agreement suggests the parties intended for matters relating to confidentiality to be addressed solely under the Nel NDA,

which does not include an arbitration clause.[14]  *Cf. Battaglia v. McKendry*, 233 F.3d 720, 729 (3d Cir. 2000) (citing the presence of an "anti-merger" provision in a Consulting Agreement between the parties, specifying that their related Settlement Agreement "does not merge into this Consulting Agreement," as suggesting that the parties intended to treat the Agreements independently, such that the arbitration clause in the Settlement Agreement would not apply to disputes arising under the Consulting Agreement); *Bianchini v. Waco Int'l Distrib. Corp.*, No. 91-6216, 1992 WL 7038, at *2 (E.D. Pa. Jan. 9, 1992) (citing the presence of an integration clause in an agreement lacking an arbitration clause as evidence that the parties did not intend to submit disputes under that agreement to arbitration).  Accordingly, the Court concludes PDC's claims against Nel, all of which concern Nel's alleged misuse of confidential information shared pursuant to the Nel NDA, are not within the scope of the arbitration clause in the Cooperation Agreement.

---

[14] The fact that the structure of the agreements in this case suggests that the parties intended for the agreements to operate separately also distinguishes this case from other cases cited by Defendants in which disputes arising under an agreement lacking an arbitration clause were found to be encompassed by an arbitration clause in a related agreement.  *See, e.g.*, *Brayman*, 319 F.3d at 625-26 (holding disputes concerning an insurer's alleged mishandling of a claim under a workers' compensation policy, which resulted in the insurer assessing the insured an additional premium under a related retrospective premium agreement (RPA) between the parties, were covered by the RPA's arbitration clause, which required arbitration of disputes with reference to any business dealing relating, in whole or in part, to the RPA); *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 910 (7th Cir. 1999) (holding a claim for tortious interference with an employment contract based on the defendant's solicitation of one the plaintiff's employees was covered by the arbitration clause in the parties' distributorship agreement where the solicitation was also alleged to constitute a breach of the distributorship agreement and where the distributorship agreement had been contingent upon the plaintiff's agreement to hire the employee in question); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 319-20 (4th Cir. 1988) (holding disputes regarding exclusive distribution agreements between the parties, and regarding purchase orders, compensation agreements, and security agreements which implemented the distribution agreements, were subject to the arbitration clauses in the distribution agreements).

Defendants' argument that PDC's claims against Adams are subject to arbitration is also based on the arbitration clause in the Cooperation Agreement between Nel and PDC. Defendants assert that although Adams is not himself a signatory to the Cooperation Agreement, he is nevertheless covered by the arbitration clause therein for acts he is alleged to have committed as an employee (or agent) of Nel. Defendants further argue that because PDC's claims against Adams are based, at least in part, on the same underlying acts of misappropriation as the claims against Nel, including the analysis and reverse engineering of compressors purchased pursuant to the Cooperation Agreement, Nel's right to compel arbitration extends to PDC's claims against Adams. Because the Court disagrees that Nel is entitled to compel arbitration of PDC's claims against it, however, the Court also finds Nel is not entitled to compel arbitration of PDC's claims against Adams.[15]

In addition to contesting Defendants' motion to compel arbitration on the merits, PDC argues Defendants have waived their right to demand arbitration by actively litigating this case in court before belatedly seeking to arbitrate the parties' disputes. Consistent with the strong

---

[15] As Defendants note, the Third Circuit Court of Appeals has repeatedly recognized that "a party, despite being a non-signatory to an arbitration agreement, may be equitably bound to arbitrate 'under traditional principles of contract and agency law.'" *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 294-95 (3d Cir. 2001)); *see also Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1121 (3d Cir. 1993) (holding the "agents, employees and representatives" of a principal bound under the terms of a valid arbitration clause are also covered by the arbitration agreement "[u]nder traditional agency theory"). Defendants argue that whether Adams, as a Nel employee, is bound by the arbitration provision in the Cooperation Agreement is governed by federal common law. PDC, in contrast, asserts that whether the arbitration provision can be construed to extend to non-signatories like Adams is a question of Danish law. Although the Court need not resolve this issue, the Court notes that the Third Circuit has recently suggested that whether a non-signatory to an arbitration agreement is bound to arbitrate depends on "whether the relevant state contract law recognizes [the particular principle of contract or agency law invoked] as a ground for enforcing contracts against third parties." *Flintkote Co.*, 769 F.3d at 220.

federal policy favoring arbitration, waiver of the right to arbitrate "is not to be lightly inferred, and . . . will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery." *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 208 (3d Cir. 2010) (quoting *PaineWebber, Inc. v. Faragalli*, 61 F.3d 1063, 1068-69 (3d Cir. 1995)).  In determining whether the right to arbitrate has been waived by litigation conduct, "prejudice is the touchstone," including "substantive prejudice to the legal position of the party claiming waiver," as well as "prejudice resulting from the unnecessary delay and expense incurred by the plaintiff[] as a result of the defendants' belated invocation of their right to arbitrate." *Id.* at 209 (citations omitted).  The Third Circuit has identified the following six factors to guide the prejudice inquiry:

> (1) [the] timeliness or lack thereof of the motion to arbitrate; (2) [the] extent to which the party seeking arbitration has contested the merits of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which a party seeking arbitration engaged in non-merits motion practice; (5) the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery.

*In re Pharmacy Benefit Managers Antitrust Litig.*, 700 F.3d 109, 117 (3d Cir. 2012) (citation omitted).  These factors, known as the *Hoxworth*[16] factors, are nonexclusive, and not all of them "need be present to justify a finding of waiver." *Nino*, 609 F.3d at 209.  Rather, "[t]he waiver determination must be based on the circumstances and context of the particular case." *Id.* (alteration in original) (citation omitted).  Upon consideration of each of the *Hoxworth* factors in

---

[16] *See Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 926-27 (3d Cir. 1992).

the context of this case, the Court agrees with PDC that Defendants have waived their right to demand arbitration of PDC's claims.[17]

As to the first factor—timeliness or lack thereof of the motion to arbitrate—Defendants filed the instant motion to compel arbitration on July 7, 2018, seven months after the Complaint was filed and served on Defendants in early December 2017.[18] While Defendants' seven-month delay in filing their motion to compel is somewhat less than the ten-month delay the Third Circuit characterized as "at the low end of the cases in which [it] ha[s] found waiver" in *In re Pharmacy*, 700 F.3d at 118, courts have found waiver in cases involving similar delays, *see Price v. UBS Fin. Servs., Inc.*, No. 17-1882, 2018 WL 1203471, at *4 (D.N.J. Mar. 8, 2018) (holding delay of "more than eight months leans toward waiver"); *Eagle Traffic Control, Inc. v. James Julian, Inc.*, 945 F. Supp. 834, 835 (E.D. Pa. 1996) (seven-month delay). Moreover, Defendants have not offered a satisfactory explanation for their delay. When pressed for a reason at oral argument, Defendants stated it was not until discovery that counsel became aware of the Cooperation Agreement. *See* Tr. 23-24, Aug. 7, 2018. But this explanation does not justify Nel's failure to assert its rights under the Cooperation Agreement earlier, particularly in light of the fact that PDC had threatened to bring suit against Defendants "in federal court in Pennsylvania" as early as April 24, 2017, more than seven months before this action was filed. *See* Decl. of Kareem Afzal in Supp. of Pl.'s Mot. for Preliminary Inj. Exs. D & E, ECF No. 18-2. The Court therefore finds this factor weighs in favor of a finding of waiver.

---

[17] The Court's waiver analysis does not extend to Nel's counterclaims, which were asserted contemporaneously with, and subject to, Nel's arbitration demand.

[18] The Complaint was filed on December 1, 2017, and Defendants immediately waived service, Nel on December 1, 2017, and Adams on December 5, 2017.

As to the second factor, Defendants have contested the merits of a majority of PDC's claims by filing a partial motion to dismiss, which required briefing and oral argument by PDC. Defendants have also contested the merits of PDC's claims in opposing PDC's motion for preliminary injunction, arguing based on the pleadings and declarations from fact witnesses that PDC cannot establish a likelihood of success on the merits. This factor thus weighs in favor of a finding of waiver. *See In re Pharmacy*, 700 F.3d at 118 (holding the filing of a Rule 12(b)(6) motion to dismiss and a motion for reconsideration, "with ample briefing and supporting documentation, and rais[ing] issues outside of the scope of the pleadings[,] . . . weigh[ed] in favor of finding waiver"); *Hoxworth*, 980 F.2d at 925 (citing defendants' filing of a Rule 12(b)(6) motion to dismiss as a factor supporting a finding of waiver).

The third factor—whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings—is analyzed in a similar manner as the first factor in the circumstances of this case. Although Defendants gave PDC advance notice of their intention to file a motion to compel arbitration, they did so only a week before filing the motion, and not until after the parties had litigated Defendants' partial motion to dismiss, agreed to an expedited discovery and trial schedule, and begun discovery. Defendants' meager advance notice did not mitigate their delay in seeking arbitration in any meaningful way; hence, this factor, like the first, weighs in favor of a finding of waiver. *Cf. Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 457-59 (3d Cir. 2011) (holding this factor weighed heavily in favor of finding waiver where plaintiff provided notification of its intent to seek arbitration the same day it filed a demand for arbitration). In arguing to the contrary, Defendants note that they "raised arbitrability as an affirmative defense in [their] Answer . . . , which is 'an important consideration' in the waiver analysis." Defs.' Reply in Supp. of Mot. to Compel

Arbitration 6 (quoting *Nino*, 609 F.3d at 211). In *Nino*, however, the Court of Appeals found the advance notice factor weighed against a finding of waiver where the defendant had filed an answer raising mandatory arbitration as an affirmative defense months before filing a motion to compel arbitration. *See* 609 F.3d at 199, 211.[19]

The fourth factor—the extent to which the party seeking arbitration engaged in non-merits motion practice—weighs slightly, if at all, in favor of a finding of waiver. Prior to filing their motion to compel arbitration, Defendants' non-merits motion practice was limited to filing motions regarding administrative matters and a motion for pre-discovery identification of trade secrets, to which PDC ultimately acquiesced. *See In re Pharmacy*, 700 F.3d at 119 (holding the fourth *Hoxworth* factor "weigh[ed] slightly in favor of waiver or [wa]s (at worst) neutral" where defendant had filed only a motion for certification of an interlocutory appeal and uncontested motions regarding administrative and scheduling matters).

The fifth factor—acquiescence to the court's pretrial orders—weighs in favor of a finding of waiver here. Defendants complied without objection with this Court's May 2, 2018, Order directing the parties to complete Rule 26(a) disclosures, to confer pursuant to Rule 26(f), and to complete and submit to the Court a joint Rule 16 conference information report in advance of the May 24, 2018, Rule 16 conference and oral argument, and they appeared and participated in that court proceeding. At the conference, Defendants agreed to the Court's proposal for a 90-day discovery period followed by a prompt trial so as to obviate the need for a separate preliminary injunction hearing (with associated discovery) and trial on the merits. And following the

---

[19] Indeed, the defendant raised the arbitration defense so far in advance of moving to compel arbitration that the court found the significance of the notice was diminished, given the defendant's failure to follow through on its intention to seek arbitration. *See Nino*, 609 F.3d at 211-12.

conference, Defendants worked with PDC to submit to the Court a joint proposed case management order, consistent with the agreed upon schedule, and a stipulated protective order. Similar levels of acquiescence have been found to weigh in favor of waiver in other cases. *See In re Pharmacy*, 700 F.3d at 119 (finding this factor "weigh[ed] somewhat in favor of waiver" where the defendant attended and participated in hearings on its motion to dismiss and motion for reconsideration and did not object to the court's orders "setting dates for the pretrial conference, and instructing the parties to submit a discovery plan and proposed case management order"); *James v. Global Tel\*Link Corp.*, No. 13-4989, 2016 WL 589676, at \*11 (D.N.J. Feb. 11, 2016) (holding this factor "weigh[ed] for waiver" where the defendant "participated without objection in a number of case management conferences, drafted and submitted a Joint Discovery Plan, negotiated a Discovery Confidentiality Order, and even negotiated and agreed to a revised scheduling order approximately a month before the [motion to compel arbitration] was filed").[20]

Finally, the Court considers the extent to which the parties have engaged in discovery. Defendants argue this factor does not support a finding of waiver because, as of the time the motion to compel arbitration was filed, PDC had produced only 394 documents and the parties had not taken any depositions. PDC notes that Defendants have pursued discovery energetically from the outset of the 90-day discovery period, serving on PDC "over 2,400 requests for admission, nearly 100 requests for production, at least twenty-five interrogatories (not including subparts), two notices of inspection, six notices of party depositions and five third party subpoenas." Decl. of Mark W. Fidanza in Supp. of PDC's Opp'n to Defs.' Mot. to Compel

---

[20] As Defendants note, the court in *James* ultimately concluded the plaintiffs in the case had not "been prejudiced to such an extent that a finding of waiver [wa]s appropriate"; however, the court found the acquiescence to pre-trial orders factor "weigh[ed] for waiver." *James*, 2016 WL 589676, at \*11.

Arbitration ¶ 5, ECF No. 51-1. Indeed, Defendants served discovery requests even before the Rule 16 conference, *see* n.7, *supra*. Although the volume of PDC's actual production as of July 6, 2018, may not have been great, PDC represents that it and its attorneys have spent "hundreds of hours attending the collection, review, and production of PDC's documents" and serving discovery of its own. Fidanza Decl. ¶ 6. The Court finds this factor weighs in favor of a finding of waiver. *See Nino*, 609 F.3d at 213 (holding the extent of the discovery conducted "weigh[ed] firmly in favor of a finding of waiver" where the parties "conferred and prepared a proposed case management order which contained no mention of arbitration, propounded interrogatories, served and supplemented disclosures, exchanged requests for document production, . . . attended the depositions of four witnesses," and engaged in significant discovery-related motion practice).

As noted, the waiver analysis depends on the circumstances and context of the particular case. In this case, Defendants moved to compel arbitration only after their partial motion to dismiss was denied and the parties had agreed to move forward on an expedited discovery and trial schedule and begun pursuing discovery consistent with agreed upon schedule. Although Defendants' delay in filing their motion to compel is not as lengthy as in some cases in which courts have found no waiver, the delay has greater significance here, given the compressed schedule to which the parties agreed and which they had begun to implement. In these circumstances, and upon consideration of the *Hoxworth* factors, all of which weigh to varying degrees in favor of a finding of waiver, the Court finds Defendants have waived their right to demand arbitration. For this reason, and because the Court also concludes PDC's claims are not within the scope of the arbitration provision in the Cooperation Agreement, Defendants' motion to compel arbitration is denied.

An appropriate order follows.

BY THE COURT:

\_\_\_\_\_/s/ Juan R. Sánchez_____
Juan R. Sánchez, C.J.